JUDGE OETKEN

12 CV 9224

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
BERISH BERGER, KILBRIDE INVESTMENTS
LIMITED, BUSYSTORE LIMITED IN LIQUIDATION,
TOWERSTATES LIMITED, BERGFELD CO.
LIMITED and ARDENLINK LIMITED                          Case No. _____

                                        Plaintiffs,

                                                      **COMPLAINT**
              -against-

CUSHMAN & WAKEFIELD OF PENNSYLVANIA,
INC., BLANK ROME LLP and COZEN O'CONNOR,
P.C.,

                                        Defendants.
----------------------------------------------------------------X

DEC 18 2012

        Plaintiffs Berish Berger ("Berger"), Kilbride Investments Limited ("Kilbride"), Busystore

Limited in Liquidation ("Busystore"), Towerstates Limited ("Towerstates"), Bergfeld Co.

Limited ("Bergfeld") and Ardenlink Limited ("Ardenlink"), by their attorneys, Morrison Cohen

LLP, as and for their complaint against defendants Cushman & Wakefield of Pennsylvania, Inc.

("C&W"), Blank Rome LLP ("Blank Rome") and Cozen O'Connor, P.C. ("Cozen") allege as

follows:

## NATURE OF THIS ACTION

        1.      This action arises from a multi-pronged fraud in which Plaintiffs, who are foreign

nationals, were duped into investing at least $27 million in a fictitious development project

called "River City" in Philadelphia, Pennsylvania.  Plaintiffs were misled to believe that River

City could and would be a 12 million square-foot mixed-use development featuring multiple

600-foot tall skyscrapers, when in fact the project was legally impermissible.

#4261462 v2 \023177 \0001

2.      Under then-applicable zoning restrictions, River City could be developed to only a small fraction of the advertised square footage, with buildings only 125 feet tall.

3.      To convince Plaintiffs and other potential investors otherwise, the project's promoters, led by non-party Ravinder Chawla ("Chawla"), acting in concert with non-party Charles M. Naselsky ("Naselsky"), a partner at Cozen and later Blank Rome, engaged in a multi-pronged fraud.

4.      In 2010, Plaintiffs obtained a jury verdict against Chawla and his co-conspirators for conspiracy to defraud, which the Third Circuit affirmed on February 23, 2012 in *Berger v. Zeghibe, et al.*, 465 Fed. Appx. 174 (3d Cir. 2012) ("*Berger I*"). Neither Naselsky nor any of the Defendants herein were parties to *Berger I*.

5.      As revealed during discovery and at trial in *Berger I*, the conspirators worked to fraudulently inflate investor perceptions of the River City site's value through the following means:

a.   Chawla, with the knowledge and participation of Naselsky, then a partner at Cozen and acting within the scope of his employment, represented to potential investors that the site was under contract of sale for $50 million, when in fact the site was under contract for only $32.5 million.

b.   Chawla, with the knowledge and participation of Naselsky, then a partner at Cozen and later Blank Rome and acting within the scope of his employment, obtained extensive architectural renderings and a 3-D model showing the purported River City development, knowing that such a development was legally impermissible given the height limitation. When asked at trial whether the presentation of the architectural models to potential investors was misleading,

Naselsky answered: "I assert my Fifth Amendment privilege against self-incrimination."

c.   Chawla, through Naselsky, then a partner at Cozen and acting within the scope of his employment, obtained an appraisal from C&W, one of the nation's pre-eminent real estate appraisal firms, valuing the River City site at $77 million. However, as the Third Circuit noted in affirming the jury verdict against Chawla for conspiracy to defraud Plaintiffs:

> the appraisal was far less than truthful; it falsely suggested that Chawla would be purchasing the property for $50 million rather than the $32.5 million Chawla had actually contracted to expend in acquiring it, and, despite the pending height restriction ordinance, it affirmatively stated that there was no applicable height limitation.  Relying on the appraisal, Berger caused one of the Berger Entities – Kilbride Investments Limited ("Kilbride") – to make a $12 million payment to facilitate the purchase of the River City property.

*Berger v. Zeghibe, et al.*, 465 Fed. Appx. 174, 177-178 (3d Cir. 2012). Evidencing C&W's recklessness, the River City site sold in March 2010 for $3 million – *a mere 4% of C&W's appraised value in 2006 and 2007.*

d.   Chawla obtained from Naselsky, then a partner at Blank Rome and acting within the scope of his employment, a memorandum on Blank Rome letterhead stating unequivocally that the River City site could be developed as presented in the architectural models, when Naselsky knew that to be false.  When asked at trial about the fact that the Blank Rome memorandum omitted mention of a then-pending height limitation that would render River City legally impermissible, Naselsky answered: "I assert my Fifth Amendment privilege against self-incrimination."

6.      In addition to above-described efforts to mislead potential investors, Chawla was charged with bribing a Philadelphia City Council aide in an unsuccessful attempt to, among other things, lift the height restriction on the River City site.  In 2009, a jury convicted Chawla of fraud, honest services fraud and conspiracy to commit fraud, and he was sentenced to 30 months in prison and fined $25,000.  In 2011, Chawla's conviction was vacated and his case remanded for retrial after the U.S. Supreme Court limited the scope of honest services fraud in *Skilling v. United States*, 130 S. Ct. 2896 (2010).

7.      Separately, in 2012, a jury convicted Naselsky of tax evasion, wire fraud and obstruction of justice for his receipt from Chawla of approximately $365,000 in direct payments in late 2005 and early 2006 for work performed on behalf of Cozen.  Naselsky was sentenced to 70 months in prison and ordered to pay $290,000 in restitution to Cozen.

8.      After sentencing, prosecutor Maria M. Carrillo was quoted in the *National Law Journal* as saying that the judge increased the sentencing guidelines range after hearing evidence from the prosecution of additional alleged illegal conduct that occurred around the same time as the conduct that resulted in the charges against Naselsky.

9.      By this action, Plaintiffs seek to recover from C&W, Cozen and Blank Rome for the millions of dollars of losses they have sustained because of C&W's fraudulent appraisal, because of Naselsky's role in the River City conspiracy while he was a partner at Cozen and Blank Rome and because of the substantial assistance provided to Chawla and his conspirators by all defendants.

## THE PARTIES

10.     Plaintiff Berger resides in and is citizen of the United Kingdom.  Berger's activities with respect to River City were undertaken on behalf of himself and as member of the

Berger family and family-owned entities. Berger manages his family's real estate business through numerous family-owned business entities. For purposes of Federal diversity jurisdiction, Berger is a citizen of a foreign state.

11. Plaintiff Kilbride is a trust incorporated under the laws of Gibraltar with its principal place of business in Gibraltar. Kilbride is ultimately owned by a discretionary trust established in Gibraltar by Berger's father for the benefit of his children, including Berger and remoter issue. On June 30, 2008, Kilbride assigned to Berger whatever claims it may have arising from the facts and circumstances alleged herein. For purposes of Federal diversity jurisdiction, Kilbride is a citizen of a foreign state.

12. Plaintiff Busystore is a United Kingdom private limited company in liquidation in London, England. Busystore's principal place of business is in London, England, and the directors of Busystore were Berger, his wife and his son. Busystore was owned solely by Astralmain, which is owned solely by Berger's wife. On June 30, 2008, Busystore assigned to Berger whatever claims it may have arising from the facts and circumstances alleged herein. For purposes of Federal diversity jurisdiction, Busystore is a citizen of a foreign state.

13. Plaintiff Towerstates is a United Kingdom private limited company with its principal place of business in London, England. The directors of Towerstates are Berger and , his wife. The shares of Towerstates are owned by Berger (1%) and his wife (99%). On June 30, 2008, Towerstates assigned to Berger whatever claims it may have arising from the facts and circumstances alleged herein. For purposes of Federal diversity jurisdiction, Towerstates is a citizen of a foreign state.

14.     Plaintiff Bergfeld is a United Kingdom private limited company with its principal place of business in London, England.  The directors of Bergfeld are Berger and some of his brothers, sisters and brothers-in-law.  All shares of Bergfeld are owned by Tripform Limited, which is jointly owned by Berger, a brother-in-law and family friend.  On June 30, 2008, Bergfeld assigned to Berger whatever claims it may have arising from the facts and circumstances alleged herein.  For purposes of Federal diversity jurisdiction, Bergfeld is a citizen of a foreign state.

15.     Plaintiff Ardenlink is a United Kingdom private company limited by guarantee and not having share capital, with its principal place of business in London, England.  The directors and guarantors of Ardenlink are Berger, his wife and his son.  On June 30, 2008, Ardenlink assigned to Berger whatever claims it may have arising from the facts and circumstances alleged herein.  For purposes of Federal diversity jurisdiction, Ardenlink is a citizen of a foreign state.

16.     Defendant C&W is a Pennsylvania corporation.  On information and belief, C&W's principal place of business is at 1290 Avenue of the Americas, New York, New York. On information and belief, for purposes of Federal diversity jurisdiction, C&W is a citizen of Pennsylvania and New York.

17.     Blank Rome is a Pennsylvania limited liability general partnership with an office at the Chrysler Building, 405 Lexington Avenue, New York, New York.  On information and belief, Blank Rome does not have any foreign partners.  On information and belief, for purposes of Federal diversity jurisdiction, Blank Rome is not a citizen of a foreign state.

18.     Cozen is a Pennsylvania corporation with its principal place of business at 1900 Market Street, Philadelphia, Pennsylvania and offices at 45 Broadway, New York, New York

and 277 Park Avenue, New York, New York.  For purposes of Federal diversity jurisdiction, Cozen is a citizen of Pennsylvania.

## JURSIDICTION AND VENUE

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(2) based upon the complete diversity of citizenship among the parties.  The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

20.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) and (3). All defendants are residents of New York.

## THE RELEVANT FACTS

### The Conspiracy

21.     The River City site is approximately 8.2 acres of land consisting of five parcels: 2001-2045 JFK Blvd., 2101-2145 JFK Blvd., 2201-2245 JFK Blvd., 2301-2345 JFK Blvd., and 60 North 23rd Street, all in Philadelphia.

22.     In early 2006, Chawla and a Philadelphia businessman named Richard Zeghibe ("Zeghibe") developed plan in which they would purchase and flip the River City site, making a $70 million profit with little or no investment.

23.     In about May 2006, Chawla and Zeghibe contracted to purchase the River City site for $32.5 million through a special purpose entity, JFK Blvd. Acquisition Partners GP LLC ("JFK").  Naselsky negotiated the contract on behalf of Zeghibe.

24.     At the time, Naselsky was a partner at Cozen.  Naselsky was a real estate transactional attorney and in that capacity, on information and belief, he advised clients on real estate transactions, negotiated contracts, authored memoranda, retained third-party vendors such as appraisers, and attended public hearings, among other things.

25.    After executing the $32.5 million contract, Chawla then executed a sham contract with Zeghibe to purchase the same property for $50 million, thus making it appear as if the property were worth substantially more than $32.5 million.

26.    Chawla and Zeghibe engaged architect James Rappoport ("Rappoport") to create elaborate development plans for a massive 12 million square foot mixed-use development on the River City site.  The design featured eight tall, pencil-thin towers along the Schuylkill River. Rappoport created a three-dimensional computer model of his River City design with an animated fly-through, a PowerPoint presentation, detailed drawings and schematics and a promotional memorandum describing his designs.

27.    On September 26, 2006, Zeghibe and Chawla contracted to sell the River City site to Eli Weinstein ("Weinstein") for $62.5 million.

28.    Weinstein would later enlist Berger as an investor in River City, and from December 18, 2006 to January 19, 2007, as result of the intentional misrepresentations and concealments with respect to the 125-foot height law and the value of the River City site, Berger was induced to request the other Plaintiffs to advance at least $27 million to Weinstein for River City.

**The C&W Appraisal**

29.    Critical to Plaintiffs' decision to invest in River City was a 2006 C&W appraisal procured by Naselsky.

30.    In May 2006, Naselsky, then at Cozen, retained C&W to appraise all five of the River City parcels.

31.    Naselsky provided C&W with the sham $50 million contract between JKF and Chawla, which C&W would reference in the Sales History section of its report.

32.     Naselsky knew that the $50 million contract was a sham because he had negotiated the true $32.5 million contract. The only purpose of the sham $50 million contract was to mislead potential investors as to the site's actual value.

33.     Indeed, Naselsky and Chawla would use this same gimmick again on another Chawla transaction. On October 30, 2006, Naselsky emailed Chawla about another appraisal that Chawla had asked Naselsky to obtain. Naselsky wrote to Chawla: "So I can push [the appraiser] in the right direction, send me the contract of sale." Chawla responded by sending Naselsky a contract that, like the $50 million contract for River City, transferred the property from one Chawla entity to another at an inflated price. Chawla explained to Naselsky: "We are doing an internal flip like in JFK [*i.e.*, River City]."

34.     C&W sent Naselsky its appraisal report on June 23, 2006. The report was "prepared for Cozen O'Connor, P.C. on behalf of its client J.F.K. Acquisition G.P., LLC" and was authored by Gerald B. McNamara ("McNamara") and Daniel J. McNeil ("McNeil").

35.     C&W valued the River City site as of August 1, 2006 at $77,000,000, or $216 per square foot of lot area.

36.     This valuation was an enormous increase over a valuation that McNamara and C&W had assigned to the site just 29 months before.

37.     In January 2004, McNamara authored a report in which C&W appraised three of the five River City parcels (2101-2145 JFK Blvd., 2301-2345 JFK Blvd. and 60 North 23rd Street) at $13,800,000, or $51 per square foot of lot area.

38.     That is, C&W's 2006 appraisal estimated that the River City site had increased in value in approximately 2½ years *by more than 300 percent*.

39.     The extraordinary magnitude of this increase is evident from the 2006 appraisal itself. Four of the five "comparable sales" that C&W used in the 2006 appraisal occurred in the time period from December 2000 to June 2005. In C&W's opinion, these sales, which C&W deemed to be the "most comparable" to the River City site, required an adjustment of *just 5 percent* to account for market appreciation. That is, whereas C&W estimated that the River City site had increased in value by *more than 300 percent* in 2½ years, it simultaneously estimated that the sites most-comparable to River City had increased by a *mere 5 percent* during that time period.

40.     C&W's 2006 appraisal makes no mention of its 2004 appraisal, and Plaintiffs were unaware of it.

41.     The principal difference between the 2004 C&W appraisal and the 2006 C&W appraisal was the River City plans. Whereas in 2004 C&W determined that the highest and best use of the site would be "[h]igh-density residential development with ancillary parking," in 2006 C&W determined that the highest and best use of the site would be "[i]nterconnecting mixed-use and residential complex with on-site parking constructed to its maximum allowable density under a governmentally approved master plan."

42.     When asked at trial in *Berger I* whether a 125-foot height limitation would have affected C&W's $77 million valuation of River City, McNeil testified: "it would have impacted the whole discussion and analysis because you would have had to, would have, the whole layout and design would have been altered."

43.     Yet, despite the fact that a height restriction on the River City site "would have impacted the whole discussion and analysis," C&W affirmatively stated in the 2006 appraisal that the River City site was not subject to any height limitation.

44.   In a table titled "Summary of Zoning District & Regulations" for River City, C&W recklessly stated that the "Maximum Bldg. Height" for each of the five parcels was "None," indicating that there was no height limit on the River City site.  According to C&W, the source of this information was "City Planning Department – City of Philadelphia, Pa.  Compiled by Cushman & Wakefield of Pennsylvania, Inc."  This information was presented as fact, not opinion, without disclaimer.

45.   Plaintiffs relied on the 2006 C&W appraisal in deciding to invest in River City.  Berger read the 115-page C&W report from cover to cover and placed great stock in the credibility that was conferred by C&W's global reputation as a pre-emininent real estate advisory and valuation firm.

46.   However, unbeknownst to Berger, as of the date of the 2006 C&W report – June 23, 2006 – a significant height limitation was pending against River City.  On April 20, 2006, Bill No. 060292, which imposed a 250-foot height limitation on an area several blocks northeast of River City, was introduced in the Philadelphia City Council.  The bill was then amended to impose a 125-foot limitation and amended again on May 25, 2006 to expand the affected area to include two of the five River City parcels, on which the planned 600-foot tall towers were to be built.

47.   As Naselsky would inform his clients, this height limitation would reduce River City's development potential by as much as *80 percent*.

48.   On June 8, 2006, the bill, as amended, was passed by committee.  Under Philadelphia's "Pending Ordinance Doctrine," which is well-known in the Philadelphia real estate community, once a bill passes committee, it is treated as law.  As Naselsky explained at trial in *Berger I*, the Pending Ordinance Doctrine "is a principle of law in which bills that are

pending before City Council will be deemed by the Licenses and Inspections Division of the City [of Philadelphia] as valid even if they are not yet adopted with respect to applications for [developers] that are pending before L&I but not yet complete."

49.     Accordingly, the statement in the 2006 C&W appraisal that the River City site was not subject to any building height limitation was false.

50.     The 2006 C&W appraisal contained no mention of the Pending Ordinance Doctrine, nor the possibility that development of the River City site could be severely limited by a pending ordinance.

51.     As a resident of London who was relatively unfamiliar with Philadelphia real estate, Berger was unaware of the Pending Ordinance Doctrine and relied on C&W to disclose such critical information to the extent that C&W made affirmative representations as to zoning matters.

52.     Indeed, C&W did not correct its erroneous statement even after the height limitation was reported in local newspapers. A December 14, 2006 article in the *Philadelphia Daily News* titled "River City Stirs a Fuss" reported that the River City project was threatened "by an ordinance sponsored by Councilman Darrell Clarke limiting new buildings in the area to a height of 125 feet or about 12 stories." According to the article, Chawla informed a local neighborhood group that the purchase of the River City site "could be threatened if lenders for the project see Clarke's height restriction enacted." The article also reported that "Clarke said case law supports the idea that the bill's provisions would affect developments beginning in June, when the bill was reported from Council's Rules Committee" – *i.e.*, before the 2006 C&W appraisal.

53.     On the same day, December 14, 2006, the *Philadelphia Inquirer* also ran an article on River City, titled "A 1,000-Foot Collossus." Like the *Daily News* article, the *Inquirer* article reported that "Chawla himself told the Logan neighbors his lenders might have second thoughts if World Acquisition Partners cannot build the towers as tall as it wants." The article noted that the River City plans called for "towers [that] soar 60 stories – close to 1,000 feet, eight times the permitted height." According to the article, the City Council "is expected today to give final approval to an ordinance imposing a 125-foot height restriction on all buildings in northwest Center City."

54.     Correspondence from Rapporport suggests that McNeil, the C&W appraiser, was aware of these developments no later than the end of February 2007. In an email dated February 23, 2007, Rappoport informed Chawla that McNeil "was well aware of the Clarke [125-foot height] ordinance."

55.     Rappoport's discussion with McNeil was prompted by a request from Naselsky in early 2007 for an updated C&W appraisal of the River City site.

56.     By the time C&W issued its updated appraisal in late February 2007, the 125-foot height ordinance had been passed by the City Council, signed by Mayor John Street, *and was law*.

57.     Nevertheless, C&W's 2007 appraisal again affirmatively stated that there was no height limitation applicable to the River City site, repeating the same purportedly factual information as contained in the 2006 C&W report, without disclaimer.

58.     The 2007 appraisal valued the the River City site, yet again, at $77 million. C&W maintained the $77 million valuation despite the fact that by February 2007, C&W had learned that Chawla had acquired the River City for $32.5 million, not $50 million, as reported in the

2006 C&W report. While acknowledging that its $77 million valuation was "significantly higher (137%, $44,500,000) than the reported cost of acquisition ($32,500,000)," C&W attempted to explain away this wide disparity on the ground that the arms-length $32.5 million sale was purportedly privately negotiated and not exposed to the market.

59.     On information and belief, Chawla was one of the most active developers in Philadelphia at the time, and an important C&W client in Philadelphia.

60.     C&W's recklessness in valuing the River City site based on a legally impermissible use is evidenced by the fact that, in March 2010, the River City site was sold for $3 million, or a mere 4% of C&W's valuations of the site in 2006 and 2007.

**The Blank Rome Memo and Naselsky's Efforts in Support of the Conspiracy**

61.     Chawla and Naselsky had learned of the pending 125-foot height limitation at least as early as August 2006. They realized that the height limitation would substantially destroy the economic value of River City.

62.     On information and belief, Chawla and Naselsky shared a objective of flipping the River City site, notwithstanding the pending height limitation, by actively concealing the existence of the ordinance from potential investors such as Plaintiffs.

63.     By August 2006, Naselsky had become a partner at Blank Rome. Naselsky was a real estate transactional attorney and, on information and belief, in that capacity he advised clients on real estate transactions, negotiated contracts, authored memoranda, retained third-party vendors such as appraisers, and attended public hearings, among other things.

64.     On August 23, 2006, Naselsky, then at Blank Rome, wrote to Chawla and others: "During our last telephone call we discussed the impact of the ordinance creating the BFParkway overlay and its impact on what we have referred to as parcels D and E [of River City]. . . . Please

note that the impact of the ordinance could be perhaps an 80% reduction in total FAR [buildable area] since building height will be capped at 125 ft from grade."

65.     During September and October 2006, Rappoport lobbied government officials to try to get the height limitation lifted.

66.     Chawla and his conspirators also devised a plan to enlist Naselsky to draft a legal memorandum stating, falsely, that the River City site could be built as envisioned by Rappoport and that no height limitation existed.  On September 28, 2006, Mark Sahaya ("Sahaya"), who was serving as a middleman between Chawla and Weinstein, sent an email to Chawla and Zeghibe updating them on Weinstein's efforts to obtain financing to close on the purchase of the River City site from JFK.  Sahaya ended his email as follows:  "PS: TRUST BLANK ROME LETTER IS IN PLACE !!!"

67.     Shortly thereafter, Naselsky sent Zeghibe a formal memorandum on Blank Rome letterhead purporting to be a "summary zoning analysis."  The memorandum, dated November 6, 2006, was authored by Naselsky and another Blank Rome partner, William F. Kerr, Jr.  The memorandum stated as follows:

> We reviewed the master plan mathematical program and plans prepared by James Rappoport, AIA-NCARB, the architect of record for our client's project, to confirm whether it is possible to construct the building area as he has proposed, as of right, and without variance relief, under the Philadelphia Zoning Code.

68.     The memorandum omits any mention of the then-pending 125-foot height limitation that rendered Rappoport's master plan legally impermissible.

69.     On information and belief, Naselsky knew that the Blank Rome memorandum would be provided to potential investors in order to assure them, falsely, that River City could be developed as planned by concealing the existence of the pending height limitation.  At trial in

*Berger I*, Naselsky was asked whether Blank Rome's "November 6th, 2006 memorandum was deceptive . . . in that it calculated square feet buildable as of right on JFK [*i.e.*, the River City site] without reference to the 125-foot ordinance." Naselsky's response was to assert his Fifth Amendment privilege against self-incrimination.

70.     Although the Blank Rome memo was not provided to Berger, it was provided to other potential investors in furtherance of the conspiracy. On November 22, 2006, Chawla and his associates provided the Blank Rome memo to a potential investor in River City, Kennedy Funding ("Kennedy").

71.     Kennedy provided approximately $20 million in funding for JFK's acquisition of the River City site. The funding from Kennedy, in addition to the funding from Plaintiffs, was critical to the purchase of the River City site.

72.     Chawla and his associates continued to provide the Blank Rome memo to prospective purchasers of the property well after the 125-foot height ordinance had been signed into law – without updating the memo to reflect the new law.

73.     When asked at trial in *Berger I* whether he knew "that the buyer was relying on your November 6 memo in going through with the purchase . . . of JFK [*i.e.*, the River City site] in your offices in December 2006," Naselsky replied: "I assert my Fifth Amendment privilege."

74.     Despite having recently authored a formal memorandum that omitted any reference to the 125-foot height limitation, Naselsky knew full well that the River City project could not be built as planned by Rappoport. On November 22, 2006, Naselsky advised Zeghibe that "As we discussed Clarke's amended overlay district for the parkway now expands the 125-foot height limit from parcels D and E to now include all 5 [River City] parcels. This means that

no building can be built on the entire River City project in excess of 125ft. Effect, project value drops 75% . . . . We need this buried in committee through year end."

75.     On November 28, 2006, the Committee on Rules of the City Council held a hearing on the 125-foot height ordinance. At the hearing, the ordinance was formally amended to limit the height of any building on parcels D and E of River City, more than half of the property, to 125 feet.

76.     After attending the November 28, 2006 City Council hearing, Naselsky wrote a series of e-mails to Chawla, Zeghibe and Rappoport. Naselsky reported: "In nutshell the hearing did not go well and the ordinance has been voted out of committee favorably. It will then go to mayor for signature which he may sign before the year is out. Clarke [the law's sponsor] intends to steam roll this through . . . ."

77.     Naselsky was keenly aware that the height limitation, if disclosed to potential investors such as Plaintiffs, would destroy Chawla's hopes of attracting outside financing. In his November 28 email, Naselsky advised Chawla and Zeghibe that the 125-foot height ordinance "presents many problems not the least of which is the notion that with a height limitation in place, lenders will re-evaluate the development potential and will not underwrite the deal in the same way. Moreover, you can not rely nor tell lenders that the situation will be fixed through the grant of variance by the [Zoning Board of Appeals], even with civic association and Clarke support." Naselsky warned Zeghibe and Chawla "don't get your hopes up" and that the 125-foot height limit "puts the project as currently designed in serious jeopardy and in fact there is little chance that it can be reliably developed from land use perspective at any where near 50% of the FAR [buildable area] you contemplate and which is permitted currently."

78.     At this point, Berger had still not even visited the River City site, and Plaintiffs had not advanced any funds.

79.     As the new height law became more certain, it presented a real crisis for the project's promoters.  On November 28 2006, Naselsky wrote an e-mail to Zeghibe, Chawla, Rappoport and others regarding the height ordinance, stating that "We need to get to the Mayor urging him to veto the bill" and that "Clarke could fix the issue by carving out the [River] City property from the [height ordinance]," but "that would make the ordinance even more suspect as being rigged and subject to challenge."  Rappoport responded to Naselsky that "[t]his is a real crisis. . . . This is a Billion Dollar issue!"

80.     Chawla, Zeghibe, Rappoport and Naselsky reached out several times to Councilman Clarke about the 125-foot height ordinance and its devastating effect on River City. Councilman Clarke never promised to exclude River City and the subject of variance was never discussed with him.

**Plaintiffs Are Defrauded**

81.     Berger was first approached about investing in River City in November 2006, by Weinstein. On December 6, 2006, at Weinstein's urging, Berger traveled to Philadelphia to learn more about the River City project.

82.     The December 6 meeting was convened at Rappoport's office to encourage Berger to invest in River City.  The meeting was attended by Berger, Chawla, Sahaya and Weinstein, among others.  At the meeting, Rappoport showed Berger a video of a three-dimensional architectural rendering, drawings and a PowerPoint presentation, all showing a 12 million square foot development plan for River City with many buildings over 50 stories tall – vastly taller than the new Philadelphia height ordinance would permit on much of the River City

#4261462 v2 \023177 \0001

site.  Rappoport gave a PowerPoint presentation which omitted mention of the drastic negative impact that Chawla and Naselsky recognized would result from the pending 125-foot height ordinance.

83.    Berger did not agree to participate in any transaction while at the December 6, 2006 meeting.

84.    On information and belief, Naselsky was aware that Chawla and his co-conspirators were fraudulently misleading Berger as to the development potential of the River City site in the hopes of inducing Berger to make a substantial investment in the River City project.

85.    At trial in *Berger I*, Naselsky was asked whether he had ever heard his clients talk about Berger, to which Naselsky replied: "I assert my Fifth Amendment privilege."

86.    Naselsky was then asked whether he had ever heard anyone talk about Berger before January 1, 2007, to which Naselsky again replied:  "I assert my Fifth Amendment privilege."

87.    At no time during or after the December 2006 meeting did anyone tell Berger about the 125-foot height law or the tremendous reduction in value to River City that it would cause.  Nor did anyone show him drawings or calculations that depicted buildings which complied with the new law.  Instead, Berger was falsely informed that the towering 50-plus-story River City designs could be built "as of right."

88.    A few days after the December 6 meeting, Chawla arranged for a copy of the 2006 C&W appraisal to be sent to Berger in London.  Berger reviewed the appraisal in great detail and relied on it in deciding to invest in River City.

89.     On December 14, 2006, the 125-foot height ordinance was unanimously approved by the Philadelphia City Council by a vote of 17-0.  No exception was made for the River City site.  Still, no one disclosed to Berger the existence of the 125-foot ordinance, much less that it had been unanimously approved by the City Council.

90.     On December 18, 2006, acting on Berger's request, Kilbride advanced $12 million from Gibraltar to a United States account controlled by Weinstein to acquire the River City site.

91.     On or about December 18, 2006, JFK Acquisition Partners, L.P. purchased the River City site for $32.5 million.  The closing occurred at the offices of Blank Rome.

92.     According to a closing statement provided by Chawla, both Cozen and Blank Rome were paid at the closing.

93.     On January 8, 2007, Berger instructed Towerstates and Ardenlink to advance an additional $4 million and $6 million, respectively, to Weinstein's control to use, at least in part, for River City.

94.     On January 19, 2007, Berger instructed Bergfeld to advance an additional $5 million to Weinstein's control to use, at least in part, for River City.

95.     Busystore supplied part of the funds advanced by Kilbride, Towerstates, Ardenlink and Bergfeld.

96.     In or about July 2010, Plaintiffs settled their claims against Rappoport in *Berger I* for a confidential sum.  Plaintiffs' recovery in this action would be net of the settlement amount.

## COUNT I
### (Fraudulent Misrepresentation against C&W)

97.     Plaintiffs repeat and reallege each and every preceding allegation as if fully set forth at length herein.

#4261462 v2 \023177 \0001

98.    The 2006 C&W appraisal affirmatively represented that there was no height limitation applicable to the River City site.

99.    This representation was false when made.

100.    C&W made this representation knowing that it might be false and failed to disclose that possibility.

101.    C&W has a global reputation as a pre-eminent real estate valuation and advisory firm and is widely respected for its reliability on real estate matters.

102.    C&W knew that readers of the 2006 C&W appraisal would rely on its contents.

103.    Berger, acting on behalf of himself and and the other Plaintiffs, justifiably relied on the affirmative representation in the C&W appraisal that there was no height limitation on the River City site.

104.    Had Plaintiffs known that the River City site was subject to a 125-foot height limitation, they would not have agreed to enter into any transactions and would not have transmitted any of their funds to Weinstein.

105.    As proximate result of the fraudulent 2006 C&W appraisal, Plaintiffs suffered damages in the amount of up to $27 million.

## COUNT II
**(Conspiracy to Defraud against Cozen and Blank Rome under Respondeat Superior)**

106.    Plaintiffs repeat and reallege each and every preceding allegation as if fully set forth at length herein.

107.    Naselsky, while a partner at Cozen and Blank Rome and acting within the scope of his employment, entered into agreements and conspired with Chawla and others for the common purpose of defrauding potential investors, including Plaintiffs.

108.   Naselsky worked in concert with Chawla and others to, among other things, conceal from potential investors that there was a 125-foot height limitation on the River City site.

109.   Naselsky and others actively participated in and benefited from the fraudulent scheme.

110.   Naselsky entered into the conspiracy with Chawla and others and acted in furtherance thereof for the purpose of injuring the financial interest of potential investors, including Plaintiffs, by means of fraud.

111.   Plaintiffs had no knowledge of the falsity of the foregoing representations and omissions and justifiably and reasonably relied on them to their detriment

112.   As proximate result of the conspiracy, Plaintiffs have been damaged in the sum of up to $27 million.

### COUNT III
### (Aiding and Abetting Fraud against C&W and Cozen and Blank Rome under Respondeat Superior)

113.   Plaintiffs repeat and reallege each and every preceding allegation as if fully set forth at length herein.

114.   C&W, through its 2006 appraisal, knowingly provided substantial assistance to Chawla and others, which aided them in their fraud against Plaintiffs.

115.   Naselsky knowingly provided substantial assistance to Chawla and others, which aided them in their fraud against Plaintiffs.

116.   As proximate result of the actions of C&W and Naselsky, Plaintiffs have been damaged in the sum of up to $27 million.

**WHEREFORE**, Plaintiffs demand judgment on the causes of action as follows:

On Count I, a judgment against C&W in an amount presently unknown but believed to be approximately $27 million ($27,000,000.00);

On Count II, a judgment against Cozen and Blank Rome in an amount presently unknown but believed to be approximately $27 million ($27,000,000.00);

On Count III, a judgment against C&W, Cozen and Blank Rome in an amount presently unknown but believed to be approximately $27 million ($27,000,000.00);

On all Counts, costs, disbursements and attorneys' fees of this action, together with such other and further relief as the Court may deem just and proper.

Dated: New York, New York
       December 18, 2012

MORRISON COHEN LLP

By: _____
      Danielle C. Lesser
      Brett D. Dockwell
909 Third Avenue
New York, New York 10022
(212) 735-8600

*Attorneys for Plaintiffs Berish Berger,*
*Kilbride Investments Limited, Busystore*
*Limited in Liquidation, Towerstates Limited,*
*Bergfeld Co. Limited and Ardenlink Limited*

#4261462 v2 \023177 \0001

23