UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
BERISH BERGER, KILBRIDE INVESTMENTS :
LIMITED, BUSYSTORE LIMITED IN            :
LIQUIDATION, TOWERSTATES LIMITED,        :
BERGFELD CO. LIMITED and ARDENLINK       :          12 Civ. 9224 (JPO)
LIMITED,                                 :
                           Plaintiffs,   :          MEMORANDUM AND
                                         :              ORDER
           -v-                           :
                                         :
CUSHMAN & WAKEFIELD OF                   :
PENNSYLVANIA, INC., BLANK ROME LLP       :
AND COZEN O'CONNOR, P.C.,                :
                           Defendants.   :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

       Plaintiffs Berish Berger, Kilbride Investments Limited ("Kilbride"), Busystore Limited in

Liquidation ("Busystore"), Towerstates Limited ("Towerstates"), Bergfeld Co. Limited

("Bergfeld"), and Ardenlink Limited ("Ardenlink") (together, "Plaintiffs"), bring this fraud

action against Defendants Cushman & Wakefield of Pennsylvania, Inc. ("C&W"), Blank Rome

LLP ("Blank Rome"), and Cozen O'Connor, P.C. ("Cozen") (together, "Defendants").  Before

the Court are Defendants' motion to transfer pursuant to 28 U.S.C. 1404(a), and C&W's motion

to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons

that follow, this action is transferred to the United States District Court for the Eastern District of

Pennsylvania.

I.     **Background**

       A.     **Factual Background**[1]

---

[1] These facts are taken from the Amended Complaint (Amended Complaint, Dkt. No. 50
("Compl.")), the allegations of which are assumed true for purposes of these motions.

This action relates to an alleged fraud involving a development project known as "River City" in Philadelphia, Pennsylvania.  River City, an 8.2 acre area of land along JFK Boulevard, was marketed as a 12-million-square-foot mixed-use development, featuring several 600-foot skyscrapers.  However, in actuality, applicable zoning regulations only permitted River City to be developed as a small fraction of the advertised square footage, with buildings only 125 feet tall.

In early 2006, non-party Ravinder Chawla and a Philadelphia businessman, non-party Richard Zeghibe, allegedly developed a plan by which they would purchase and flip the River City site, hoping to secure a multi-million-dollar profit.  In May 2006, Chawla and Zeghibe contracted to purchase River City for $32.5 million through a special purchase entity, and Charles M. Naselsky, a partner at Cozen, and later, Blank Rome, negotiated the contract on behalf of Zeghibe.  Next, Chawla executed a "sham" contract to purchase the same property for $50 million, artificially inflating the property's worth.

Chawla and Zeghibe contracted with James Rappoport to develop plans for the River City site.  The design was elaborate, consisting of eight towers along the Schuylkill River in Philadelphia.  Rappoport also developed a three-dimensional computer model, complete with an animated fly-through, a PowerPoint presentation, drawings and schematics and a promotional memorandum describing the designs.  In September 2006, Zeghibe and Chawla contracted to sell the site to Eli Weinstein for $62.5 million.  Later, Weinstein, Chawla, and other associates would solicit Berger as an investor in River City.  Berger alleges that, as a result of intentional misrepresentations regarding the zoning restrictions, from December 2006 to January 2007, he invested at least $27 million in River City through Weinstein.

2

Defendant C&W completed appraisals on the River City project, one of which was instrumental in Berger's decision to invest in the venture.  This report was authored by Gerald B. McNamara and Daniel J. McNeil—state-certified appraisers—and purported to comply with the Uniform Standards of Professional Appraisal Practice ("USPAP").   C&W was retained by Naselsky, while he was at Cozen, to appraise the River City project, and included the "sham" $50 million sales contract among Chawla, Zeghibe, and the original special-purpose entity in its appraisals, but nevertheless completed no real due diligence on this sales history.  As of August 2006, C&W valued the River City site at $77 million, which Plaintiffs contend was an "enormous" increase over the valuation that McNamara had originally assigned to the site 29 months prior.  The 2006 appraisal did not mention the 2004 appraisal, and Plaintiffs claim they were unaware of it.

Plaintiffs also claim that C&W knew that the River City project could not be built as marketed, given the applicable zoning criteria and the fact that the project exceeded the permissible square footage ratio by 25.48%.  Instead, Plaintiffs contend, C&W simply presumed that the project would eventually comply somehow with the restrictions, without disclosing these assumptions to Plaintiffs.  Moreover, Plaintiffs add that C&W made little effort to determine the physical viability of the proposed skyscrapers, despite the fact that 80 to 85% of the River City property is within a designated flood plain.  According to Plaintiffs, C&W's recklessness is apparent from the fact that in March 2010, the River City site was sold for $3 million—only 4% of C&W's 2006 and 2007 valuations of its worth.

Chawla and Naselsky both knew of the 125-foot height limitation by 2006, as evidenced by an email from Naselsky, then at Blank Rome, to Chawla and others noting that the building height "will be capped at 125 ft from grade," with respect to the River City project.  Rappoport

3

also allegedly lobbied Philadelphia officials in an attempt to get the height limitation lifted. However, Plaintiffs claim, all efforts were made to keep the 125-foot limitation a secret, with Naselsky and another Blank Rome partner, William F. Kerr, Jr., writing a November 2006 memorandum discussing the River City project that omitted any mention of the limitation.  This memo was purportedly provided to putative investors in the site; however, Plaintiffs never viewed it.  One potential investor, Kennedy Funding ("Kennedy") did see the memo, and later provided $20 million for the acquisition of the site.  Despite attempts to lobby the Philadelphia City Council, the 125-foot height ordinance was unanimously approved by the Philadelphia City Council on December 14, 2006, and no exception was made for the River City project.

As noted, Berger was first approached about investing in River City in November 2006. He traveled to Philadelphia in December 2006, at Weinstein's suggestion, and met with Rappoport, Chawla, Weinstein, and Mark Sahaya, a real estate broker.  Rappoport showed Berger his three-dimensional model, drawings, and PowerPoint presentation, detailing the River City plan, all of which showcased buildings over 50 stories tall.  Berger alleges that he was falsely informed that the tall buildings could be built "as of right."  After examining the C&W 2006 appraisal, Berger began investing in the River City project, advancing the first of his funds on December 18, 2006—eventually contributing $27 million to the doomed enterprise.

### B.      Pennsylvania Litigation

These events have been the subject of protracted litigation in the U.S. District Court for the Eastern District of Pennsylvania.  In March 2007, Berger first brought suit against Weinstein and Chawla, alleging fraud and conversion.  (*See* Declaration of John G. Harkins, Jr., Dkt. No. 17 ("Harkins Decl."), Ex. A.)  Several other defendants were later added to this action (*Berger I*), including the special purpose entity Naselsky and Chawla used in their original transaction.

4

Eventually, these defendants moved for summary judgment, and the Pennsylvania district court dismissed on standing grounds, as the monies advanced by Berger came from various funds with which he was affiliated, but did not originate from Berger directly.  *See Berger v. Weinstein*, Civ. A. No. 07-994, 2008 WL 3183404, at *4-*5 (E.D. Pa. Aug. 6, 2008), *aff'd*, 348 F. App'x 751 (3d Cir. 2009).  Berger then had the claims of his investing entities assigned to him and filed a new suit with similar allegations relating to the River City project in Philadelphia on August 20, 2008 (*Berger II*).   (Harkins Decl., Ex. C.)  Berger also filed a third suit on December 18, 2008 (*Berger III*) (*id.*, Ex. D), which was eventually consolidated with *Berger II*.   This consolidated action later went to trial, with a jury finding Weinstein, Chawla, and Sahaya liable for various iterations of fraud, conspiracy to defraud, and unjust enrichment, and awarding Berger millions in damages.  (*Id.*, Ex. E.)  The district court denied Chawla's post-trial motion for a judgment as a matter of law, *Berger v. Zeghibe*, Civ. A. No. 08-5861, 2010 WL 4054274 (E.D. Pa. Oct. 14, 2010), and the Third Circuit affirmed the judgment, 465 Fed. App'x 174 (3d Cir. 2012).

### C. Procedural Background

Plaintiffs filed the instant action in December 2012 (Dkt. No. 1), and all defendants filed their joint motion to change venue in January 2013 (Dkt. No. 16.)  Also in January 2013, Cozen answered (Dkt. No. 14) and C&W moved to dismiss the Complaint (Dkt. No. 27).  Plaintiffs filed an amended complaint in February 2013 (Dkt. No. 50), and, in March 2013, both Blank Rome and Cozen answered (Dkt. Nos. 55, 56).  Also in March 2013, C&W again moved to dismiss.  (Dkt. No. 58.)

## II. Standard for Transfer

Title 28 U.S.C. § 1404(a) provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district where it might

have been brought . . . ."  Accordingly, the "threshold question," when determining whether

transfer is appropriate, is whether the action *could* have been brought originally in the transferee

forum.  *Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 694-95 (S.D.N.Y.

2009) (Chin, J.).  After a court determines that the action could have been permissibly brought in

the transferee forum within the strictures of 28 U.S.C. § 1391(b),[2] it then must examine whether

convenience and the interests of justice warrant a transfer.  *Eslworldwide.com, Inc. v. Interland,*

*Inc.*, No. 06 Civ. 2503 (LBS), 2006 WL 1716881, at *3 (S.D.N.Y. June 21, 2006) ("Having

concluded that this case 'might have been brought' in the proposed alternative district, the Court

must now examine whether a transfer is warranted for the convenience of the parties and

witnesses and in the interest of justice.").  In determining whether transfer is in the interests of

convenience and justice, the Second Circuit has specified several factors to which courts must

look:

> (1) the plaintiff's choice of forum, (2) the convenience of
> witnesses, (3) the location of relevant documents and relative ease
> of access to sources of proof, (4) the convenience of parties, (5) the
> locus of operative facts, (6) the availability of process to compel
> the attendance of unwilling witnesses, and (7) the relative means of
> the parties.

---

[2] Title 28 U.S.C. § 1391(b) provides:

> A civil action may be brought in—
> (1) a judicial district in which any defendant resides, if all
> defendants are residents of the State in which the district is located;
> (2) a judicial district in which a substantial part of the events or
> omissions giving rise to the claim occurred, or a substantial part of
> property that is the subject of the action is situated; or
> (3) if there is no district in which an action may otherwise be
> brought as provided in this section, any judicial district in which
> any defendant is subject to the court's personal jurisdiction with
> respect to such action.

6

*New York Marine and Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 112 (2d Cir. 2010)

(quoting *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 106-07 (2d Cir. 2006) (quotations

omitted)).  To this basic structure, other factors have been added to reflect a careful balancing

among the interests at stake in a given litigation.  *See, e.g.*, *Everlast World's Boxing

Headquarters Corp. v. Ringside, Inc.*, No. 12 Civ. 5297 (PAE), 2013 WL 788054, at *6

(S.D.N.Y. Mar. 4, 2013) ("Assessing whether transfer is a valid exercise of discretion requires

the Court to balance various factors: (1) the convenience of the witnesses; (2) the convenience of

the parties; (3) the location of relevant documents and the relative ease of access to sources of

proof; (4) the locus of operative facts; (5) the availability of process to compel the attendance of

unwilling witnesses; (6) the relative means of the parties; (7) the forum's familiarity with the

governing law; (8) the weight accorded the plaintiff's choice of forum; and (9) trial efficiency

and the interests of justice." (citations omitted)); *Virgin Enter. Ltd. v. Am. Longevity*, No. 99 Civ.

9854 (CSH), 2001 WL 34142402, at *8 (S.D.N.Y. Mar. 1, 2001) (same (citations omitted)).

   "Section 1404(a) strives to prevent waste 'of time, energy and money and to protect

litigants, witnesses and the public against unnecessary inconvenience and expense.'"  *In re

Nematron Corp. Sec. Litig.*, 30 F. Supp. 2d 397, 399 (S.D.N.Y. 1998) (quoting *Wilshire Credit

Corp. v. Barrett Capital Mgmt. Corp.*, 976 F. Supp. 174, 180 (W.D.N.Y. 1997) (internal

quotations omitted)).  And as such, motions for transfer are within the "broad discretion" of the

trial court.  *Id.* (quoting *Linzer v. EMI Blackwood Music Inc.*, 904 F. Supp. 207, 216

(S.D.N.Y.1995) and *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 117 (2d Cir. 1992)).  The

aforementioned factors aid in, and guide, this analysis; nevertheless, "[t]here is no rigid formula

for balancing these factors and no single one of them is determinative.  Instead, weighing the

balance is essentially an equitable task left to the Court's discretion."  *Larew v. Larew*, No. 11

Civ. 5771 (BSJ) (GWG), 2012 WL 87616, at *3 (S.D.N.Y. Jan. 10, 2012) (quotations and

citation omitted).   It is the defendant's burden to show, through clear and convincing evidence,

that transfer is appropriate.  *Virgin*, 2001 WL 34142402, at *8; *accord Atl. Recording*, 603 F.

Supp. 2d at 695 ("The burden rests on the moving party to make a 'clear and convincing'

showing that transfer under Section 1404(a) is proper." (citing *Millennium, L.P. v. Dakota*

*Imaging, Inc.*, No. 03 Civ.1838 (RWS), 2003 WL 22940488, at *6 (S.D.N.Y. Dec. 15, 2003)

("The burden is on the moving party, here defendants, to make a clear and convincing showing

that transfer is proper." (citations omitted))).

## III.    Application of Law to Facts

Plaintiffs do not dispute that the threshold requirement for § 1404(a) analysis has been

met: namely, that this action could have been brought in the Eastern District of Pennsylvania

under 28 U.S.C. § 1391(b)(1), as Defendants are residents of Philadelphia, Pennsylvania.  (*See*

Memorandum of Law in Opposition, Dkt. No. 48 ("Pl.'s Opp."), at 4 n.2.)  Accordingly, the

Court turns to the factor analysis in determining whether the interests of convenience and justice

warrant transfer.

### A.    Factors

#### 1.    Convenience of Parties and Witnesses

##### a.    Convenience of the Parties

As a general rule, "plaintiff's choice of forum is entitled considerable weight, and should

not be disturbed unless the balance of the several factors is strongly in favor of the defendant."

*Orb Factory, Ltd. v. Design Sci. Toys, Ltd.*, 6 F. Supp. 2d 203, 210 (S.D.N.Y. 1998) (citation

omitted).  Accordingly, when "the balance of convenience is in equipose, plaintiff's choice of

8

forum should not be disturbed."  *Levine v. Arabian Am. Oil Co.*, No. 84 Civ. 2396 (RLC), 1984 WL 1247, at *2 (S.D.N.Y. Nov. 16, 1984) (quotations and citation omitted).  Moreover, given these considerations, where a venue change would merely "shift the inconvenience from one party to another," the balance cuts against transfer.  *See Orb*, 6 F. Supp. 2d at 210; *accord Virgin*, 2001 WL 34142402, at *9 ("The convenience of the parties does not weigh in favor of transfer where such transfer would merely shift the inconvenience of litigating in a particular forum from one party to the other." (citation omitted)).

While Defendants all have New York offices, as the facts underlying Plaintiffs' claims are associated with a Philadelphia real estate transaction in which the Philadelphia branches of the defendant-entities were involved, it seems logical that Pennsylvania would obviously be more convenient for Defendants.  Nevertheless, Plaintiff Berger, although a British national, has established that New York is more convenient for him given his religious practices and family ties to the region.  (*See generally* Declaration of Berish Berger in Opposition to Defendants' Motion to Transfer Venue ("Pl.'s Decl.") (noting that he has rented an apartment in New York since 2008, has myriad family here, and is a follower of the Grand Rabbi of Satmar, located in Williamsburg, Brooklyn).)

While Philadelphia may indeed be more convenient for Defendants, Berger chose New York for his own convenience, and as a venue change would merely "shift" the inconvenience from Defendants to Berger, this factor weighs in favor of Plaintiffs.

### b.    Convenience of Witnesses

"Courts typically regard the convenience of witnesses as the most important factor in considering a § 1404(a) motion to transfer."  *Herbert Ltd. P'ship v. Elec. Arts Inc.*, 325 F. Supp. 2d 282, 286 (S.D.N.Y. 2004) (citations omitted); *accord Everlast*, 2013 WL 788054, at *6 ("The

convenience of witnesses is an important consideration, and has often been described as the single most important § 1404(a) factor." (citing cases)). "In evaluating this factor, the court should look beyond the quantity of witnesses and assess the quality of the testimony to be offered." *Larew*, 2012 WL 87616, at *4 (quotations and citations omitted); *accord Herbert Ltd. P'ship v. Elec. Arts Inc.*, 325 F. Supp. 2d 282, 286 (S.D.N.Y. 2004) ("When assessing the convenience of witnesses, a court does not merely tally the number of witnesses who reside in the current forum in comparison to the number located in the proposed transferee forum. Instead, the court must qualitatively evaluate the materiality of the testimony that the witnesses may provide." (citing cases)). In order to do so, a court must necessarily be provided some idea of what the testimony of important witnesses shall be; accordingly, "[a] party seeking to rely on the convenience of the witnesses factor must identify the material witnesses and supply a general description of what their testimony will cover." *Dealtime.com v. McNulty*, 123 F. Supp. 2d 750, 755 (S.D.N.Y. 2000) (citation omitted); *accord Gen. Elec. Capital Corp. v. Titan Aviation, LLC*, No. 06 Civ. 4795 (LTS)(FM), 2007 WL 107752, at *6 (S.D.N.Y. Jan. 16, 2007) ("The moving party must supply an affidavit that contains detailed factual statements explaining why the motion should be granted, including information on the potential principal witnesses along with a general statement as to their testimony. 'Vague generalizations and failure to clearly specify the key witnesses to be called, along with a statement concerning the nature of their testimony, are insufficient basis upon which to grant a change of venue under § 1404(a).'" (quoting *Orb*, 6 F. Supp. 2d at 208 (internal citation omitted)).

As a threshold matter, Plaintiffs submit that Defendants have not carried their requisite burden by failing to submit an affidavit with their moving papers specifying both the purportedly material witnesses, together with their respective locations and likely testimony. (Pl.'s Opp. at

10.)  The Court disagrees.  First, together with their motion, Defendants provided two affidavits, which specified the locations of various potential witnesses.  (*See* Declaration of Ira A. Roseneau, Dkt. No. 18 ("Roseneau Decl."); Declaration of Jayne A. Risk, Dkt. No. 19 ("Risk Decl.").)  And while potential testimony was not provided in those declarations, Defendants' memorandum lists the putative witnesses, together with their role in the alleged scheme, giving at the very least a general indication of the testimony.  For example, Defendants cite the following witnesses: (1) Zeghibe, one of the purported orchestrators of the River City project, who lives in the suburbs of Philadelphia and works in Philadelphia proper; (2) McNamara, one of the C&W employees who prepared the relevant 2006 appraisal of the River City site, who resides in Pennsylvania and works at C&W in Philadelphia; (3) McNeil, a C&W employee who prepared the 2006 appraisal, who works in New York City; (4) Rappoport, the creator of the architectural models and plans that were driving forces behind Plaintiffs' investment in River City, who lives and works in Philadelphia; (5) Karen Daroff, a designer alleged to have participated in the scheme with her husband, Rappoport, who resides and works in Philadelphia; (6) Naselsky, one of the alleged integral parts of the scheme, who is now incarcerated in federal prison in Brooklyn for unrelated charges; (7) Kerr, the alleged co-author of the Blank Rome zoning memo, who resides in Pennsylvania and works in Norristown, Pennsylvania; (8) Chawla, one of the orchestrators of the purported scheme, who lives in Abington, Pennsylvania; (9) Weinstein, the "principal tortfeasor" against Plaintiffs, who lives in New Jersey; and (10) Sahaya, a real estate broker allegedly involved in the scheme who lives in New Jersey and works in Philadelphia.  In addition, Plaintiffs name Berger and Kennedy Funding as witnesses, noting that Kennedy—located in Englewood Cliffs, New Jersey—will testify as to the C&W appraisal

11

and the Blank Rome memorandum, together with its provision of $20 million for the financing of River City.

Of these 11, non-party witnesses, six individuals live or work in the Philadelphia area, while five live or work in New York City, Brooklyn, or New Jersey. Plaintiffs claim that the Pennsylvania-based witnesses are nothing more than tangential witnesses, cited by Defendants in an attempt to "pad" their § 1404 motion with witnesses outside of the Southern District of New York. Moreover, Plaintiffs note that it is not the number of witnesses that is dispositive for this particular factor, but rather, the weight of their respective testimony. While the Court agrees that sheer force of numbers will not convert several inconsequential witnesses into an amalgamation of important ones, Plaintiffs' characterization of the witnesses cited by Defendants seems, in most cases, incorrect.

Although at first glance, the testimony of McNamara, Kerr, and Daroff, all of whom reside and work in Pennsylvania, seems of equivalent value to that of McNeil, Sahaya, and Kennedy, who are located in New York and New Jersey, the former grouping likely offers more potential insight into the particular scheme alleged in this Complaint. First, McNamara and McNeil, C&W employees, authored the crucial 2006 appraisal together. McNamara's testimony may be of slightly more import, however, as he did provide a valuation for the River City site in 2004, as well as 2006, so he can testify concerning the discrepancies in those two valuations. (Compl. at ¶¶ 50-51.) Second, the substance of Kerr's testimony, a Blank Rome partner who allegedly co-authored the zoning analysis memorandum with Naselsky, is roughly equivalent to that of Sahaya, a "middleman" between Chawla and Weinstein, as both can provide some insight into their observations and involvement, but neither served as a central organizer of the alleged scheme. Again, however, Kerr, as a co-author with a central player—Naselsky—may have some

added testimony concerning Blank Rome's role in portraying the River City site as a sound investment, which is central to Plaintiffs' fraud claim.  Third, Daroff, Rappoport's wife, is not mentioned in the Complaint, which, Plaintiffs argue, diminishes the putative value of her testimony.  Nevertheless, she could certainly be called as a witness in this case.  For example, the Complaint in *Berger III*, which named Daroff as a defendant, alleged that Daroff's design firm created "elaborate development plans"—at the behest of Chawla and Zeghibe—"to appear to justify a $52 million mortgage on the same property [Chawla and Zeghibe] were purchasing for $32.5 million."  (Harkins Decl., Ex. D., at ¶ 41.)  Daroff, as Rappoport's wife and business associate, thus was allegedly intimately involved in the creation of the three-dimensional models that were so effective in convincing Berger to invest.  While Plaintiffs contend that Kennedy, a New Jersey-based fund that invested $20 million in River City, is a critical witness, more important than the tangential witnesses cited by Defendants, the Complaint suggests otherwise, mentioning Kennedy only three times.  (*See* Compl. at ¶¶ 120-21.)  Kennedy's funding was "critical" to the purchase of River City; however, it is hard to imagine that the testimony of another investor could be more central to proving Plaintiffs' case than that of the individual who was allegedly contracted to advertise a development that was infeasible in light of zoning restrictions.  Moreover, although Sahaya lives in New Jersey, he *works* in Philadelphia.  Accordingly, for three of the six witnesses just discussed, who are of approximate equal importance, Philadelphia is more convenient; for one of the six, Philadelphia is equally convenient; and for two, Philadelphia is less convenient.

Additionally, Rappoport, Zeghibe, Chawla, Weinstein, and Naselsky are named as potential witnesses, with Plaintiffs underscoring the importance of Chawla, Weinstein, and Naselsky's testimony.  Despite Plaintiffs characterization to the contrary, Rappoport and

Zeghibe's potential testimony seems to be of crucial import; in fact, Rappoport and Zeghibe are mentioned 18 and 14 times, respectively, in the operative Complaint.  Rappoport, the creator of the allegedly convincing three-dimensional model of the River City site, purportedly emailed Chawla in 2007, discussing McNeil's awareness of the 125-foot restriction.  (Compl. at ¶ 85.) Rappoport also allegedly lobbied Philadelphia officials in an attempt to get the height restriction lifted.  (*Id.* at ¶ 115.)  Rappoport's plans were also the subject of the Blank Rome memorandum. (*Id.* at ¶¶ 116-118.)  Moreover, the Complaint includes a description of a "series of e-mails," sent by Naselsky to Chawla, Zeghibe, and Rappoport, in which Naselsky reported on the 125-foot restriction's durability and expressed a desire to convince the mayor of Philadelphia to veto the bill.  (*Id.* at ¶¶ 126-129.)  Rappoport himself is cited in the Complaint as writing to Naselsky regarding the restriction, "[t]his is a real crisis. . . .  This is a Billion Dollar issue!"  (*Id.* at 129 (alteration in original).)   Importantly, the December 6, 2006 meeting, which Berger attended to learn about the project, was held at Rappoport's Philadelphia office, and Rappoport himself displayed the plans and models of the site for Berger.

Zeghibe and Chawla are also crucial witnesses, as they allegedly developed the original plan by which the River City property would be flipped for a profit.  (*Id.* at ¶¶ 22-23.)  Zeghibe and Chawla are mentioned throughout the Complaint, engaging Rappoport to create the River City designs and contracting with Weinstein to sell River City.  (*Id.* at ¶¶ 26-28.)  In sum, Rappoport, Zeghibe, and Chawla—all crucial figures in the Complaint—are all located in Philadelphia.  Weinstein and Naselsky are also undeniably important as witnesses, given their integral role in alleged fraud.  And they are located in New Jersey and Brooklyn, respectively. However, Weinstein's hometown of Lakewood, New Jersey is essentially equidistant from

14

Philadelphia (69.5 miles) and New York City (68.5 miles).  Accordingly, the analysis of

Weinstein's convenience is neutral, favoring neither Plaintiffs nor Defendants.

Finally, Plaintiffs, as noted, name Naselsky as a crucial witness—a point with which

neither Defendants nor the Court disagrees, as he is mentioned 60 times in the operative

Complaint and was at the very heart of the alleged fraud.  Naselsky is currently incarcerated in

federal prison, where he will remain until 2017, and is presently housed in a facility in Brooklyn,

New York.  In support of their position that it would be enormously inconvenient for Naselsky to

be transported to Philadelphia, Plaintiffs cite numerous cases denying transfer out of the district

in which a putative witness is incarcerated.  (*See* Pl.'s Opp. at 11 (citing cases).)  And while

Naselsky's presence near the Southern District of New York is a factor that weighs in favor of

maintenance of the action here, he is, after all, only a single witness, whose lone presence

adjacent to this district fails to overcome Rappoport's, Zeghibe's, and Chawla's presence in the

Eastern District of Pennsylvania.  The cases cited by Plaintiffs support the view that a witness's

incarceration in or near a district weighs in favor of keeping a case, or transferring a case, to that

district.  They do not, however, support the view that incarceration alone is sufficient to override

other witnesses, who are equally important, who reside in another locale.  *See, e.g.*, *Solar v.

Annetts*, 707 F. Supp. 2d 437, 442 (S.D.N.Y. 2010) ("The convenience of the parties and non-

party witnesses is generally viewed as the most important factor, as it is specifically enumerated

in the venue transfer statute.  Here, *all remaining Defendants* reside in the Northern District.

Moreover, Solar is currently incarcerated at Collins in the Western District of New York—which

is closer to the Northern District than this District—meaning this critical factor weighs in favor

of transfer.  *Documents and other evidence relevant to the actions of Defendants are also in the

Northern District*." (citations omitted) (emphasis added)); *SEC v. Lybrand*, No. 00 Civ. 1387

15

(SHS), 2000 WL 913894, at (S.D.N.Y. July 6, 2000) (noting, in a discussion of the convenience of the parties, that "New York is just as plainly more convenient for Lybrand, who not only has a residence in New York but also is presently incarcerated in the Southern District.  Therefore, this factor either slightly favors the Southern District or is neutral"); *Diogenes v. Malcolm*, 600 F. Supp. 815, 818 (E.D. Pa. 1985) (transferring a habeas case from Pennsylvania to New York where "[a]ll of the contacts that the petitioner ha[d] had in the federal justice system [were] in districts other than the Eastern District of Pennsylvania"; his "custodian [was] the warden at the Federal Correctional Institution at Ray Brook, New York, where [he was] imprisoned"; "transfer would ensure that petitioner would be treated under the same interpretation of the law as other prisoners incarcerated at the Federal Correctional Institution at Ray Brook, New York, and would discourage forum shopping"; *and* "the inconvenience of transporting petitioner from New York to Philadelphia for any hearings would make New York a more appropriate forum" (citation omitted)); *Rios v. Riley*, No. 89 Civ. 213, 1989 WL 86037, at *1 (S.D.N.Y. July 27, 1989) (holding that Defendants failed to show that convenience or justice warranted transfer from the Southern District, to the Western District of New York, even though Plaintiff had been incarcerated in the Western District of New York, noting that Plaintiff was currently incarcerated in the Eastern District of New York on Staten Island).

Plaintiff claims that of the six "key witnesses" identified in their opposition—Naselsky, McNeil, McNamara, Berger, Kennedy, and Chawla—New York is more convenient for four of them (all but McNamara and Chawla).  And, to remedy the inconvenience for the Pennsylvania-based witnesses, Plaintiffs assert that they are prepared to depose those witnesses in Philadelphia if necessary.  (Pl.'s Opp. at 13, 15.)  This analysis, however, ignores the reality of the potentially crucial, Pennsylvania-based witnesses cited by Defendants and overlooks the possibility that

16

McNamara and Chawla's involvement with the case may extend beyond deposition testimony to presence at trial or other involvement, thus rendering Plaintiffs' solution for those particular individuals an imperfect one.  And while Defendants indeed reference Plaintiffs' prior litigation in their descriptions of likely witnesses, as discussed, with the exception of Daroff, Defendants' Philadelphia-based witnesses are mentioned consistently throughout the Complaint in the instant case: *e.g.*, Chawla (57 times); Rappoport (18 times); Zeghibe (14 times).  Naselsky (mentioned 60 times in the Complaint) is the only comparable non-party witness with ties to New York.  And, while it is undoubtedly difficult to remove incarcerated individuals from prison to testify in *general*, once thus removed it is not clear that shifting a prisoner from Brooklyn to Manhattan is overwhelmingly more convenient than driving that same prisoner the 100-odd miles to Philadelphia.  Again, while Naselsky's presence in New York, albeit not within the Southern District, weighs in favor of Plaintiffs based on sheer proximity, it is not enough to override the fact that all other crucial witnesses (Chawla, Zeghibe, and Rappoport), save Weinstein, are Pennsylvania-based.  Plaintiffs also cite Berger as a twelfth witness for whom New York is more convenient, evening the split of witnesses to six who are Philadelphia-based,[3] four who are New York- or New Jersey-based,[4] and two for whom either New York or Philadelphia would be equally convenient.[5]  However, it is well established that courts "give[] the inconvenience of party witnesses less weight than [they do] that of nonparty witnesses."  *Soto v. Bey Transp. Co.*, No. 95 Civ. 9329 (PKL), 1997 WL 407247, at *3 (S.D.N.Y. July 21, 1997) (citations omitted);

---

[3] Zeghibe, Chawla, Rappoport, McNamara, Daroff, and Kerr are all Philadelphia-based.

[4] Naselsky, Kennedy, McNeil, and Berger are all New York- or New Jersey-based, and the Southern District of New York is closer to them than Philadelphia.

[5] Weinstein and Sahaya are neutral, as Weinstein's home is equidistant from Philadelphia and New York, and Sahaya lives in New Jersey but works in Philadelphia.

*accord See ESPN, Inc. v. Quiksilver, Inc.*, 581 F. Supp. 2d 542, 547 (S.D.N.Y. 2008)

("Moreover, '[t]he convenience of non-party witnesses is accorded more weight than that of

party witnesses.'" (quoting *Indian Harbor Ins., Co. v. Factory Mut. Ins. Co.*, 419 F. Supp. 2d

395, 402 (S.D.N.Y. 2005) (alteration in original))).

Accordingly, the convenience of the witnesses militates in favor of transfer to

Pennsylvania, as four of the most important witnesses (Zeghibe, Chawla, Rappoport, and

McNamara) are Philadelphia-based and only one of most crucial non-party witnesses (Naselsky)

is located closer to the Southern District of New York than Philadelphia.

### 2.  Location of Documents and Sources of Proof

The location of documents and sources of proof is another consideration in the § 1404(a)

calculus.  However, "[t]he location of documents and records 'is not a compelling consideration

when records are easily portable.'"  *Am. Eagle Outfitters, Inc. v. Tala Bros. Corp.*, 457 F. Supp.

2d 474, 478 (S.D.N.Y. 2006) (citations omitted).  Defendants contend that the vast majority of

the relevant documentation is located in the Eastern District of Pennsylvania, noting that the law

firm defendants' records are in Philadelphia, together with the records of C&W.  Moreover,

Philadelphia City Council records are, of course, in Philadelphia, together with the court records

from the prior, related litigation.  No records are located in the Southern District of New York,

although Plaintiffs assert that Plaintiffs' documents are all "located outside of Philadelphia,

including in New York, in Mr. Berger's home office" in Brooklyn.  (Pl.'s Opp. at 19.)  Plaintiffs

also assert that all records cited by Defendants are easily transferrable and accessible online.

*Am. Steamship Owners Mut. Prot. & Indem. Ass'n, Inc. v. Lafarge N. Am., Inc.*, 474 F. Supp. 2d

474, 484 (S.D.N.Y. 2007), *aff'd sub nom. New York Marine & Gen. Ins. Co. v. Lafarge N. Am.,

Inc.*, 599 F.3d 102 (2d Cir. 2010) ("The location of relevant documents is largely a neutral factor

in today's world of faxing, scanning, and emailing documents.").  Here, there are no special

factors that suggest the documents are not accessible online, including the City Council records,

which are available at the Council's Legislative Information Center.  Accordingly, this factor is

neutral, except to the extent that some of the Pennsylvania defendants' documents may not be

available online and would have to be transported to the Southern District of New York,

something which Defendants have not suggested.

### 3.        Locus of Operative Facts

"The locus of operative facts is a 'primary factor' in determining whether to transfer

venue."  *Id.* at 485 (citation omitted).  This factor will "substantially favor[] transfer from this

district when a party 'has not shown that any of the operative facts arose in the Southern District

of New York.'"  *Everlast*, 2013 WL 788054, at *8 (quoting *Dr. Boy GmbH v. Nationwide Ins.*,

No. 96 Civ. 3217 (AGS), 1996 WL 350699, at *2 (S.D.N.Y. June 25, 1996)).  Thus, in these

instances, the interests of justice tend to be best served by transfer "to a district where the key

operative events occurred . . . ."  *Id.* (citation omitted).

Defendants assert that nearly all of the events underlying the Complaint occurred in

Philadelphia; Plaintiffs contest this classification, arguing that "Defendants ignore the fact that

Plaintiffs' injuries have a direct connection to New York," citing the fact that Berger was

originally solicited in New York, drove from New York to Philadelphia for Defendants'

presentation, and suffered injuries overseas, rather than in Philadelphia.  The Court disagrees

with Plaintiffs' characterization, as Philadelphia is clearly the locus of the alleged fraud that is

central to the Complaint.  For example, the scheme was developed in Philadelphia, by two

Philadelphia businessmen (Compl. at ¶ 23); the real property that is the subject of this entire

fraud, River City, is located in Philadelphia, along the Schuylkill River (*id.* at ¶ 26); Rappoport, a

Philadelphia architect, developed the plans and models used to advertise the site (*id.*); these designs were shown to Berger at a meeting that occurred in Philadelphia (*id.* at ¶ 132); C&W, a Philadelphia-based company, performed the relevant appraisals upon which Berger relied (*id.* at ¶¶ 29-45); the Philadelphia City Council decision confirming the height restriction occurred, of course, in Philadelphia (*id.* at ¶¶ 53, 56); Naselsky, then a partner at Cozen, and later Blank Rome, based in their Philadelphia offices, was intimately involved in all aspects of the alleged fraud (*see, e.g.*, *id.* at ¶ 23); and *all prior litigation* involving the River City fraud occurred in the Eastern District of Pennsylvania (*see* Harkins Decl., Exs. A-G.)  The fact that Berger drove to Philadelphia from New York and reviewed the 2006 appraisal in London cannot render a nullity the operative facts' clear ties to the Eastern District of Pennsylvania.  At bottom, the alleged fraud was primarily perpetrated by Pennsylvania-based individuals, working for Pennsylvania companies, and involved sales, investments, and appraisals associated with real property located in Philadelphia, Pennsylvania.  Moreover, the restriction that allegedly destroyed the value of the River City site is an ordinance approved by the Philadelphia City Council and signed by its mayor.  Without a doubt, the locus of operative facts constitutes the Eastern District of Pennsylvania.  Additionally, there are no facts alleged to have occurred in the Southern (as opposed to the Eastern) District of New York.  Accordingly, this factor weighs heavily in favor of transfer.

### 4.    Availability of Process to Compel the Attendance of Witnesses

Pursuant to Federal Rule of Civil Procedure 45, a court may issue a subpoena to any witness outside its district "within 100 miles of the place specified for the deposition, hearing, trial, production, or inspection."  Fed. R. Civ. P. 45(b)(2)(B).  Defendants contend that the Court's subpoena power under Rule 45 would fail to reach Zeghibe, Rappoport, Daroff, Chawla,

and Kerr, stating that they are beyond the 100-mile limit.  (Def.'s Mem. at 14.)  "[T]he 100 mile

radius in Rule 45 is measured in a straight line, *i.e.,* 'as the crow flies,' and not by the usual

driving route."   *Universitas Educ., LLC v. Nova Grp.*, *Inc.*, No. 11 Civ. 1590 (LTS)(HBP), 2013

WL 57892, at *2 (S.D.N.Y. Jan. 4, 2013) (citing cases); *accord Schwartz v. Marriott Hotel

Servs., Inc.*, 186 F. Supp. 2d 245, 251 (E.D.N.Y. 2002) ("Moreover, to a reasonable degree of

certainty, the Court finds it likely that the four allegedly non-party witnesses are subject to this

Court's subpoena power.  The 100 mile travel rule set forth in Rule 45(b)(2) is measured from a

person's residence, workplace or place in which he regularly conducts business.  The method of

measurement is by a straight line rather than the usual 'travel route method.'" (quoting *Hill v.

Equitable Bank, Nat'l Ass'n*, 115 F.R.D. 184, 186 (D. Del. 1987)); *James v. Runyon*, No. 91 Civ.

246, 1993 WL 173468, at *2 (N.D.N.Y. May 17, 1993) ("The '100 mile' provision in the Federal

Rules is measured along a straight line on a map rather than along the ordinary, usual and

shortest route of public travel." (citing cases)).

Zeghibe resides in Merion Station, Pennsylvania (Roseneau Decl. at ¶ 2), which is

approximately 80 miles, as the crow flies, to the courthouse in the Southern District of New

York, and around 93 miles by car.  Rappoport and Daroff live in Philadelphia (*id.* at ¶ 3), which

is also approximately 80 miles, as the crow flies, to the New York courthouse, and around 92

miles by car.  Chawla lives in Abington, Pennsylvania (*id.* at ¶ 7), which is approximately 70

miles, as the crow flies, and 86 miles by car.  Lastly, Kerr lives in Harleysville, Pennsylvania (*id.*

at ¶ 6), which is approximately 75 miles from the courthouse, as the crow flies, and 106 miles by

car.  Accordingly, all of the witnesses mentioned by Defendants are, in fact, within the Court's

subpoena power.  As such, this factor is neutral.

### 5.      Relative Means of the Parties

"Where an apparent disparity exists between the parties, such as when an individual sues a large corporation, the court should consider the relative means of the parties." *Schwartz*, 186 F. Supp. 2d at 251.  Here, there are entities on either side of the lawsuit, and while Plaintiffs are indeed "small family trusts" (Pl.'s Opp. at 21), the factor is neutral, as travel to Philadelphia or maintenance of the action here in New York do not impose means-based hardships for either Plaintiffs or Defendants.  *See Virgin*, 2001 WL 34142402, at *10 (S.D.N.Y. Mar. 1, 2001) ("Though it is fair to say that Virgin has greater financial means to litigate this matter, the Court does not believe this factor can weigh in favor of one party or the other where the profits of both parties are significant." (citations omitted)); *cf. Schwartz*, 186 F. Supp. 2d at 251 ("At first blush, this factor appears to weigh heavily against transfer, because Schwartz is an individual suing Marriott, which is undeniably a large corporation.  However, the argument against transfer is mitigated by the fact that the District Court for the District of New Jersey is, at most, 65 miles from this Court.  Thus, any increased cost the plaintiff might face by having to litigate the case in New York is minimal.").

### 6.      Forum's Familiarity with Governing Law

"To [the] extent this action raises questions of federal law, either forum is equally capable of hearing and deciding those questions." *Dostana Enterprises LLC v. Fed. Express Corp.*, No. 00 Civ. 0747 (RWS), 2000 WL 1170134, at *6 (S.D.N.Y. Aug. 16, 2000).  To the extent, however, that a case raises state law issues, "then the greater familiarity of the federal court sitting in that forum militates somewhat in favor of transfer."  *Id.* (citations omitted). Regardless of whether the case is transferred to Pennsylvania or remains in New York, "any choice of law analysis will be conducted under the choice of law rules of New York," as the

22

choice of law principles of the transferor court govern even in the transferee court.  *See id.*

(citing *Van Dusen v. Barrack*, 376 U.S. 612, 821 (1964) (other citations omitted)).  In New York,

if there is a conflict of laws, tort actions are subject to so-called "interests analysis," meaning that

the laws of the forum with the greatest interest in the adjudication will apply.  *Curley v. AMR*

*Corp.*, 153 F.3d 5, 12 (2d Cir. 1998) (citing cases).  "'Under this formulation, the significant

contacts are, almost exclusively, the parties' domiciles and the locus of the tort.'"  *Id.* (quoting

*AroChem Int'l, Inc. v. Buirkle*, 968 F.2d 270, 270 (2d Cir. 1992) (quotations and citation

omitted).

      Here, given the aforementioned significant contacts with Pennsylvania, the fact that the

alleged tort occurred, almost entirely, in the Eastern District of Pennsylvania, with a few, isolated

aspects occurring in the Eastern District of New York and in the United Kingdom, and the fact

that it was committed by entities and individuals domiciled in Pennsylvania, it appears highly

likely that Pennsylvania substantive law will apply in the event of any conflict of law.  *See, e.g.*,

*Dostana*, 2000 WL 1170134, at *6 ("Given the lack of contacts between this forum and the

instant dispute, as explained above, these rules would call for application of the substantive law

of Tennessee." (citation omitted)).  Presumably, Pennsylvania district courts will be better

equipped to apply substantive Pennsylvania state law than this Court, especially to the extent that

specific zoning ordinances may be implicated as the case moves forward.  While Plaintiffs are

correct in noting that, if transferred, the Pennsylvania district court will be required to apply

certain New York procedural rules pertaining to statute of limitations and like issues,[6] these

---

[6] While generally a federal court sitting in diversity must apply the choice of law analysis of the forum state, *Forlastro v. Collins*, No. 07 Civ. 2325865 (RPP), at *2 (S.D.N.Y. 2007), as noted *supra*, the Supreme Court has held that "following a transfer under § 1404(a) the transferee court must follow the choice of law rules that prevailed in the transferor court."  *Farens v. John Deere*

limited, procedural applications that may arise in the litigation do not override the claims'

relationship to Pennsylvania and the likelihood that Pennsylvania substantive law will apply

where ever a conflict arises.  Accordingly, this factor favors transfer.

### 7.    Weight Afforded to Plaintiff's Choice of Forum

Courts "do not lightly disturb a plaintiff's choice of venue."  *O'Connor v. Fischbein*, Civ.

A. No. 09-4931, 2010 WL 1053220, at *6 (E.D. Pa. Mar. 16, 2010).  And "[t]he Second Circuit

has consistently held that 'a plaintiff's choice of forum is presumptively entitled to substantial

deference.'"  *Atl. Recording*, 603 F. Supp. 2d at 698 (quoting *Gross v. BBC*, 386 F.3d 224, 230

(2d Cir. 2004) (citation omitted)).  "This deference stems from the presumption that a plaintiff

selects a forum based on convenience."  *Medien Patent Verwaltung AG v. Warner Bros. Entm't,

Inc.*, 749 F. Supp. 2d 188, 190 (S.D.N.Y. 2010) (citation omitted).  The presumption in favor of

Plaintiff's choice is strongest, however, "where the chosen forum is also the plaintiff's home."

*Atl. Recording*, 603 F. Supp. 2d at 698 (citations omitted); *accord Caldwell v. Slip-N-Slide

Records, Inc.*, No. 10 Civ. 9106 (JFK), 2011 WL 3251502, at *2 (S.D.N.Y. July 26, 2011)

("Generally, the plaintiff's choice of venue is given deference; however, where the chosen forum

is not the plaintiff's home forum, the choice is given somewhat less deference." (citation

omitted)).  Some courts have also noted that foreign plaintiffs are afforded less deference than

---

*Co.*, 494 U.S. 516 (1990); *see also Van Dusen*, 376 U.S. at 612.  Accordingly, the Pennsylvania court will be required to apply New York's choice of law rules in the event of a conflict of law. New York district courts, as a general rule subject to some exceptions, when presented with a conflict, apply New York's statute of limitations.  *See Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 626-27 (2d Cir. 1998) ("Where jurisdiction rests upon diversity of citizenship, a federal court sitting in New York must apply the New York choice-of-law rules and statutes of limitations.  New York courts generally apply New York's statutes of limitations, even when the injury giving rise to the action occurred outside New York.  This general rule, however, is subject to a traditional statutory exception, New York's 'borrowing' statute, C.P.L.R. § 202.").

their domestic counterparts.  *See, e.g.*, *Creaciones Maternales De Mexico, S.A. de C.V. v. Kiddie Products, Inc.*, No. 94 Civ. 8007 (JFK), 1995 WL 617188, at *3 (S.D.N.Y. Oct. 20, 1995) ("Additionally, a foreign plaintiff's choice of forum deserves less deference." (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981), *reh'g denied*, 455 U.S. 928 (1982) (other citations omitted))).

Here, Berger contends that travel to Philadelphia for litigation-related hearings or conferences, and perhaps eventually for a trial, would present a substantial inconvenience. Berger has "extensive family and religious connections to New York," keeping an apartment in Brooklyn and worshiping with the Satmar community in Williamsburg, Brooklyn.  According to Berger, there is no "suitable Hasidic synagogue" in Philadelphia where he "would be comfortable praying," meaning he would have to stay in New York and commute to Philadelphia.  (Berger Decl., at ¶ 14.)  Moreover, Berger adheres to dietary restrictions in conformance with his religious practices, and thus, would have to bring along to Philadelphia "any food that [he] would require so as to conform with the specific strictures of [his] religious diet."  (*Id.* at ¶ 15.)  Due to his connections to New York, Berger asserts that, even in the event of transfer, he will never fly from London to Philadelphia, despite the availability of direct flights. Instead, he will fly to New York and commute from Williamsburg, Brooklyn to Philadelphia. Given these circumstances, Berger's choice of forum is, of course, afforded some weight. Nevertheless, this factor does not militate as strongly against transfer as it would if Berger were a resident of either the Southern District of New York or the United States, his ties to the region notwithstanding.  Moreover, the Court notes that given the proximity of Philadelphia to New York, and the myriad transportation options that exist between the two cities, Berger's

inconvenience is not so severe as to prevent him from commuting for a given hearing or conference date.

### 8.      Trial Efficiency and the Interests of Justice

Defendants contend that trial efficiency and the interests of justice mandate transfer to Pennsylvania, as "the Eastern District of Pennsylvania is already familiar with the underlying events in this case."  (Def.'s Mem. at 17.)  However, as Plaintiffs point out, when related cases in a putative transferee district are no longer pending, transfer does not result in consolidation.  *See In re Warrick*, 70 F.3d 736, 740 (2d Cir. 1995) (finding abuse of discretion in mandamus action when district court transferred a case solely in the interests of judicial efficiency, after determining that the transferee forum had previously addressed the same complex facts in a prior, related action, but where said prior action was no longer pending).  Moreover, as *Berger I, II*, and *III*, were resolved more than one year ago, under the Eastern District of Pennsylvania's Local Rules, the instant litigation will not qualify as a "related case."  E.D. Pa. Local Rule 40.1(b)(3) (" At the time of filing any civil action or proceeding, counsel shall indicate on the appropriate form whether the case is related to any other pending or within one (1) year previously terminated action of this court.").  Thus, this action would not automatically be assigned to Judge Berle Schiller, who presided over the prior litigation.  While there still might be some efficiency given the relatively recent adjudication of closely related litigation in Pennsylvania, the Court treats this factor as neutral, as there is no efficiency or consolidation benefit to be gained by a transfer to the Eastern District of Pennsylvania.

### B.      Balance of Factors and Result

Based on the above analysis, two factors weigh in favor of maintaining this action in the Southern District of New York: (1) the convenience of the parties, and (2) the weight accorded to

26

Plaintiff Berger's choice of forum.  Two factors weigh strongly in favor of transfer to the Eastern District of Pennsylvania: (1) the convenience of the witnesses, and (2) the locus of operative facts.  One factor slightly favors transfer to Pennsylvania: the forum's familiarity with governing law; and four factors are neutral: (1) the location of documents and sources of proof, (2) the availability of process to compel the attendance of witnesses, (3) the relative means of the parties, and (4) trial efficiency and the interests of justice.  This tabulation, however, does not tell the entire story, as there is genuinely only one circumstance that counsels against transfer: the convenience of Plaintiff Berger and his resultant choice of forum.

The Court recognizes the importance of the weight accorded to a plaintiff's choice of forum.  That said, Berger does not live in the Southern District of New York and is not a United States citizen.  Regardless of where this litigation occurs, he will be traveling from London to the United States.  Moreover, while sensitive to the strictures of Berger's religious edicts, attending hearings in the Eastern District of Pennsylvania, while an inconvenience, is certainly possible given the entirely feasible commute between Williamsburg, Brooklyn and Philadelphia.  And while these circumstances might not yield to transfer in the ordinary case, they must where, as here, virtually *all* of facts relevant to the alleged tort occurred in the transferee district and *none* of the relevant facts occurred in the Southern District of New York.  Berger's familial and religious ties to New York, together with the location of some witnesses in New Jersey and New York, are not enough to keep this case here, given the centrality of the Eastern District of Pennsylvania to the vast majority of the allegations in the Complaint.  Moreover, Berger has previously filed three lawsuits in Pennsylvania, one of which went to trial, evidencing that venue in the Eastern District of Pennsylvania, while perhaps not as convenient as venue here, is feasible.  At bottom, this was a Pennsylvania-based fraud, involving Pennsylvania real property,

27

allegedly perpetrated by Pennsylvania-based individuals, with claims asserted against Pennsylvania-based entities.  Accordingly, this case should be decided by the district court in the Eastern District of Pennsylvania.

## IV.   Conclusion

For the foregoing reasons, Defendants' motion to transfer is GRANTED, and this case is transferred to the U.S. District Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1404(a).  Additionally, Defendant C&W's motion to dismiss is DENIED without prejudice to reapplication in the transferee Court, in accordance with the local rules of the Eastern District of Pennsylvania and any individual practices of the judge assigned to the case. The Clerk of Court is directed to close the motions at docket entry numbers 15, 27, and 58.

SO ORDERED.

Dated: New York, New York
       August 28, 2013

J. PAUL OETKEN
United States District Judge